UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| EVELYN HOLTEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2:13-CV-112 (CEJ) |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On March 23, 2011, plaintiff Evelyn Holtel filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of April 25, 2005, which was subsequently amended to March 23, 2011.[1]  (Tr. 154-160, 161-68, 33-34).  After plaintiff's applications were denied on initial consideration (Tr. 95-101, 102-08), she requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 109-10).

Plaintiff and counsel appeared for a hearing on June 5, 2012.  (Tr. 29-80).  The ALJ issued a decision denying plaintiff's applications on July 17, 2012.  (Tr. 8-28).  The Appeals Council denied plaintiff's request for review on October 24, 2013.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

---

[1]As a result of the amended date of onset, plaintiff no longer qualified for benefits under Title II.  See Tr. 33 (ALJ explained that in order for plaintiff to qualify for Title II benefits, he would have to find that she became disabled on or before June 30, 2006, and her medical records started in 2008).

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 186-97), plaintiff listed her disabling conditions as attention deficit disorder, depression, pain in both legs and knees, burning and tingling in her right leg, trouble staying awake, and chest pains. She left her work as a poultry processor on April 25, 2005, to deal with her son's behavioral problems. Between 1997 and 2005, she worked for brief periods as a line worker in a manufacturing plant, a processor in poultry and hog plants, and a babysitter. (Tr. 180). Plaintiff's medications included Alprazolam to treat anxiety and Ampheta S/Combo to treat attention deficit disorder. (Tr. 182). Between 2009 and March 2011, she participated in court-ordered family counseling. (Tr. 183).

Plaintiff completed a Function Report on March 28, 2011. (Tr. 186-97). Her daily activities included watching television, making phone calls, reading the newspaper, and attending medical and counseling sessions. She reported that her three children were removed from her care by the Department of Family Services because she was unable "to keep [her] house clean enough and a constant eye on them." (Tr. 187). She provided some care for a cat and a dog. She managed her personal care without assistance or reminders, but she used an alarm to remind her to take medication. She did her own laundry and took care of some housecleaning and yard work, but took a lot of breaks. She was able to drive a car and go out alone. She went shopping for groceries and other necessities once a week. She was able to pay bills, handle a checkbook and savings account, and count change. She talked with her children on the telephone every day. She prepared simple meals for herself. Her hobbies included reading and watching television; she also liked to play video and

computer games.  Although she liked to do needle work, she was not able to do it very often due to swelling and numbness in her hand.  Plaintiff had difficulty with lifting, standing, squatting, walking, bending, reaching, sitting, kneeling, climbing stairs, seeing, memory, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with others.  She could lift 5 to 10 pounds and walk for about 30 minutes before she needed to rest for 5 minutes.  She had lost jobs because she could not handle being criticized for her performance and she did not respond well to stress.  She felt increasing stress when she was out in public, especially around law enforcement officers.

Plaintiff's husband, Billy Holtel, completed a Third-Party Function Report.  (Tr. 198-206).  He stated that he went to plaintiff's house on weekends to help her clean and do laundry.  He stated that plaintiff did not do "much if anything at all" on a daily basis.  She sometimes cooked dinner, but could not work at a fast pace.  She was slow getting up in the morning and was sleeping "more and more every day."  (Tr. 198, 201).  Plaintiff was limited in her abilities to lift, climb stairs, walk, reach, complete tasks, and concentrate.  He described her as "blow[ing] up really bad" when under stress, and stated that she became angry and upset when her routines changed.  Mr. Holtel completed another report in July 2011, stating that plaintiff was too slow to work and that she was unable to care for the children without help.  (Tr. 223-26).  He said her bipolar disorder and anxiety had them "in a bind" with his job and the children.  She experienced pain in her knees and arms.  She sometimes slept for 12 hours because of the medication she took.  He stated that she could walk one block, stand for two hours, and sit for one and a half hours.  She screamed and yelled at him when

under stress if her medications were "too low." She often forgot to make phone calls, pay bills or buy groceries.

## B. Testimony at Hearing

Plaintiff was 33 years old at the time of the hearing. (Tr. 38). She graduated from high school with a license as a certified nursing assistant. (Tr. 43). She lived with her husband, who was employed and provided health insurance coverage for her. Their three children—aged 13, 11, and 3—were removed from their care in early 2011.[2] Plaintiff and her husband were trying to find more adequate housing so that they could regain custody of the children.[3] (Tr. 38-39, 68). (Tr. 38-39). They drove every weekend to visit with family or with the children.

Plaintiff testified that she was unable to work because her social anxiety had increased. (Tr. 47). Under questioning from her attorney, she testified that in 2007 she was diagnosed with mild depression, which she described as fluctuating. About once a week she had a crying spell and about once a month she stayed in bed for two days at a time. (Tr. 66-67). Adderall helped her to stay awake and to focus, although she still dozed off while watching the news. (Tr. 68-69). Plaintiff testified that she was also easily distracted by loud noises or having people around her. (Tr. 69).

Plaintiff received testing services from Rebecca Still and weekly individual and family counseling from Laura Still. (Tr. 48-49). At the time of the hearing, the family was participating in court-ordered counseling, with a focus on plaintiff's anger and depression. (Tr. 48, 51, 70).

---

[2]She testified that she went to jail for one or two weeks. (Tr. 38-39)

[3]Plaintiff testified that this was the second time the children were removed. (Tr. 38).

When asked about physical problems that kept her from working, plaintiff testified that she had burning, numbness, and tingling in her right thigh if she stood or sat for too long.  (Tr. 54-55).  Her physician had previously opined that the pain was due to a pregnancy-related pinched nerve that would resolve itself after her child was born.  She took over-the-counter medicines for the pain.  (Tr. 56).  She was able to sit for one to two hours before needing to stand and to sit for four hours in an eight-hour day.  She could walk for about an hour before needing to rest and for a total of two to four hours in an eight-hour day.  (Tr. 59).  She could stand for 15 minutes at a time and about two hours in an eight-hour day.  (Tr. 58).  She was more active when she was with her three-year old. (Tr. 56-57).  She had not required surgery or been to a hospital or emergency room since 2005.  (Tr. 55).  She generally saw her primary care physician only when she needed refills for her prescriptions.  (Tr. 53).

The ALJ asked plaintiff about her past work experience.  (Tr. 43-47).  In 1997, plaintiff worked as a poultry processor.  In 2000, she worked for one month as a neck bone trimmer.   The state paid her to babysit for six months in 2003 and 2004.   In June or July 2004, she started working again as a poultry processor.  She was laid off between August and October of that year and quit in April 2005 because she was getting a lot of calls from her oldest son's school due to his behavioral issues.

Plaintiff testified that on a typical day, she might take a shower and eat breakfast.  (Tr. 60-61).  Her husband or father did much of the cooking, but she could manage a box dinner.  She and her husband ate out when there was money to do so.  (Tr. 62).   She did laundry, but her husband carried the baskets up and down stairs for her and did most of the mopping and vacuuming.  She did grocery shopping either

alone or with her husband. She liked to read books and magazines and watch television. (Tr. 64).

Michael J. Wiseman, a vocational expert, testified that plaintiff's past work as a poultry processor was classified as light and unskilled, with a Specific Vocational Preparation (SVP) level of 2.[4] The ALJ asked Mr. Wiseman about the employment opportunities for an individual of plaintiff's age, education, and work experience, who could perform medium work; could remember and carry out simple instructions, use judgment, relate to supervisors and co-workers in usual work settings; and could deal with changes in a routine work setting. Mr. Wiseman opined that such an individual could return to plaintiff's past relevant work. (Tr. 74). He was next asked to assume that the individual was limited to light work and, in addition to the nonexertional limitations previously described, should avoid concentrated exposure to hazards. Mr. Wiseman opined that such an individual would be precluded from performing work as a poultry processor, which required use of knives. (Tr. 75). However, the individual would be able to work as a housekeeper, cafeteria attendant, or small products assembler, which are all classified as light and unskilled, with an SVP of 2. Finally, the ALJ asked Mr. Wiseman to assume that the same individual was moderately limited in the ability to understand, remember and carry out simple instructions; and was markedly limited in the ability to make judgments on simple work-related decisions,

---

[4]The SVP level listed for each occupation in the Dictionary of Occupational Titles (DOT) connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010). At SVP level 2, an occupation requires more than a short demonstration but not more than one month of vocational preparation; level 3 covers occupations that require over 30 days and up to and including 3 months; level 4 covers occupations that require over 3 months and up to and including 6 months. 20 C.F.R. § 656.3.

interact appropriately with supervisors and co-workers, and respond appropriately to usual work situations and changes in routine. Mr. Wiseman responded that these limitations would eliminate all competitive work. (Tr. 77). In response to questions from plaintiff's counsel, Mr. Wiseman opined that an individual who required two unexcused absences a month and breaks beyond midmorning, lunch, and midafternoon would be able to obtain employment but could not retain it for very long.

## C. Medical Records

In January 2008, G. Michael Early, D.O., plaintiff's primary care physician, prescribed the antidepressant Celexa for plaintiff. (Tr. 254). In October 2009, plaintiff was prescribed Adderall for treatment of attention deficit disorder. (Tr. 248). In November 2010, plaintiff reported that she had injured her right arm in a fall. She stopped taking Celexa in December 2010 because it made her sleepy and did not work. She was prescribed Xanax in February 2011. Id.

In March 2011, the Adair County Children's Division asked Rebecca S. Still, a licensed psychologist, to complete a psychological evaluation of plaintiff after her children were removed due to "severe physical abuse" of one child by plaintiff's husband. (Tr. 266-87). Plaintiff was charged with child endangerment because she failed to protect the children. The agency expressed concern about poor communication between family members, plaintiff's lack of recognition of her own poor actions and the consequences of conduct. (Tr. 269). Rebecca Still administered tests to assess attention deficit hyperactivity disorder, cognitive functioning, depression, self-esteem, anxiety, and parental stress as well the Minnesota Multiphasic Personality Inventory (MMPI). Rebecca Still described plaintiff as "interested in the tasks" and employing "an orderly approach." (Tr. 270). There were no overt signs of anxiety but

there were possible signs of depression.  Plaintiff exhibited a somewhat blunted affect.
She rarely became discouraged but needed occasional reassurance.  She did not seem
distractible and her activity level was appropriate.   She did not have difficulty
understanding the instructions and was friendly and cooperative.  Rebecca Still noted
that there was a possibility the profile was inaccurate due to plaintiff's tendency to
exaggerate psychopathology.[5]  (Tr. 274).

Plaintiff's cognitive functioning was in the low average range and no specific
learning disabilities were identified. (Tr. 272).   She showed clinically significant
problems in motor functioning, memory, sequencing, visual processing and attention.
She scored within the mild range on a depression inventory and the moderate range
on an anxiety questionnaire, and she was assessed as having low-self esteem, which
Ms. Still opined was likely to be valid.  (Tr. 277).  The diagnostic impression included
adjustment disorder with mixed anxiety and depressed mood, post-traumatic stress
disorder, bipolar disorder not otherwise specified, generalized anxiety disorder, and
avoidant personality disorder.  She was assigned a current Global Assessment of
Functioning (GAF) score of 55.[6]

_____

[5]For example, plaintiff self-reported as "high" in inattention/memory problems
and inattentive symptoms.  However, she received a score of 10 on a test where a
score of more than 20 indicates a strong tendency toward ADD.  (Tr. 270).

[6]The GAF is determined on a scale of 1 to 100 and reflects the clinician's
judgment of an individual's overall level of functioning, taking into consideration
psychological, social, and occupational functioning.  Impairment in functioning due to
physical or environmental limitations are not considered.   American Psychiatric
Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text
Revision 32-33 (4th ed. 2000).  A GAF of 51-60 corresponds with "moderate symptoms
(e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in
social, occupational or school functioning (e.g., few friends, conflicts with peers or co-
workers)."  Id. at 34.

Laura Still, LCSW, provided individual and family counseling to plaintiff and her family between March 2011 and January 2012. In a report written on March 16, 2011, Laura Still wrote that plaintiff displayed temper spells a child and was placed on Tegretol because of her aggressive behaviors. (Tr. 285). She had no difficulties with appetite or sleep and got up in the morning without difficulty. Her husband described her as inattentive and disorganized. At the time of the report, plaintiff was taking Adderall and Xanax, as prescribed by her primary care physician. Counseling notes indicate that plaintiff routinely failed to complete the tasks required in order to have her children returned to her care (*e.g.*, Tr. 370, 361, 360, 359, 357, 355, 354, 353), her oldest son continued to have aggressive outbursts while on visits, in foster care, and at school (Tr. 367, 362, 350, 347-48, 398-402), and plaintiff and her husband disagreed about having the children returned from foster care (Tr. 366, 351). In addition, Ms. Still noted marital discord (Tr. 364, 351) and Mr. Holtel's ongoing criminal proceedings arising from his assault of their oldest son (Tr. 351, 393).

On May 3, 2011, Jeffery Harden, D.O., performed a psychiatric evaluation of plaintiff on behalf of the Adair County Department of Social Services. (Tr. 320-23). Plaintiff believed that she was intermittently disabled from working because she completed tasks slowly. When she was criticized for this slow performance, she became very upset and tearful. She also believed that she suffered from recurrent depression, starting in elementary school. She was psychiatrically hospitalized for one month in 6th grade after she threatened to harm others. Plaintiff reported that she was able to do her own cooking, cleaning, driving and shopping, and could handle money, medication, and personal hygiene. She liked reading and spending time on the computer and did not engage in any group or social activities outside her home.

On examination, Dr. Harden noted that plaintiff was on time, with casual attire and appropriate grooming. She showed logical thought processes with no speech eccentricities. Her affect was well modulated. She reported that her mood and sleep were satisfactory, as were her energy and concentration when she took her medication. However, her appetite, motivation and overall enjoyment of life were poor. Plaintiff was fully oriented and her general fund of information, concentration, memory, and abstract thought were all adequate. She displayed appropriate social judgment and insight into her own situation. Dr. Harden's diagnostic impressions included bipolar disorder I, most recent episode depressed, and obesity. He assigned GAF scores of 55 for the past year and 50 at the time of the assessment.

On May 12, 2011, Stephen R. Bergman, D.O., conducted a disability evaluation of plaintiff, based on her allegations of attention deficit disorder and chronic pain and numbness in her legs and right shoulder. (Tr. 289-93). At the evaluation, plaintiff reported that she had pain and swelling in her hands and wrists, with occasional numbness at night. The pain was not constant, and typically registered between 2 and 4 on a 10-point scale, but sometimes was as high as 8 and woke her from sleep. Plaintiff also experienced pain and numbness in her thighs, chronic pain in her knees, and weakness in her right ankle. Plaintiff reported that she had been diagnosed with mild depression in 2007, when her children were removed from her care for the first time because the family house was deemed to be unsanitary. She experienced "ups and downs" in her mood after her children were removed for a second time, but denied debilitating depression. (Tr. 290). She had "plenty of energy throughout the day" with Adderall. Id. She was easily fatigued in the evenings and slept fairly well at night.

Adderall also helped with her attention deficit disorder. Plaintiff described chest pains that Dr. Bergman attributed to anxiety or rib dysfunction.

On physical examination, Dr. Bergman noted that plaintiff was 4 feet, 10.5 inches tall and weighed 260 pounds, yielding a body-mass index of 54.5. Plaintiff had some decreased sensation and numbness in her thighs, but otherwise her sensation and motor functions were intact. Her deep tendon reflexes were normal and equal bilaterally, as was her strength as measured in both upper and lower extremities. Her grip was normal. She was able to stand, walk on her heels and toes, and squat and kneel, although with some knee pain. Tinel's test for carpal tunnel syndrome was positive in both wrists, with the left being slightly worse that the right, with mild swelling and fluid retention. Otherwise, she had good dexterity and fine finger movement with her hands. All of her range of motion was intact and without deficit. She had tenderness on palpation of the knees.

Dr. Bergman's medical impressions included morbid obesity, chronic knee pain, bilateral meralgia paraesthetica, bilateral carpal tunnel syndrome, more severe on the left, tendonitis in the right shoulder, anxiety and depression, history of attention deficit disorder, and history of exercise induced asthma. Dr. Bergman opined that plaintiff "had an undercurrent of anxiety and attention deficit that has contributed to her not working since 2005. Her depressive symptoms are also playing a significant role in that scenario." It was Dr. Bergman's opinion that, physically, she was able to function fairly normally and could perform normal work-related functions, with some decreased functional capacity due to carpal tunnel syndrome and nerve sensitivity in her thighs.

James L. Tichenor, Ph.D., performed a consultative psychological examination on May 17, 2011. (Tr. 299-301). Dr. Tichenor noted that plaintiff was generally alert

-11-

but somewhat withdrawn, with somewhat blunted affect. Her speech quantity was low average with no articulation difficulties. She was oriented to person, place and time. Her recent and remote memory were adequate and her immediate memory was average. Her performance on several tasks suggested that she had less than average basic arithmetic skills, a possible mild deficit in cognitive processing efficiency, a deficit in abstraction ability, and less than average general intellectual functioning. There was no indication that impulse control was a problem, and her thought processes were logical and coherent. Her score on a self-report of depressive symptoms was within the mild range. Dr. Tichenor concluded that plaintiff was under stress due to "current legal and child difficulties" which presented a severe challenge to her ability to cope. (Tr. 301). Her ability to understand and remember instructions, to concentrate and sustain on-task performance, and to interact socially and adapt were lower than average but did not completely preclude gainful employment. Her less-than-average learning ability would be a factor in her ability to obtain and maintain employment. Dr. Tichenor opined that plaintiff's emotional difficulties were likely to be temporary if she received appropriate support services. She might also require assistance in managing money. He diagnosed plaintiff with adjustment disorder with anxiety and depressed mood, moderate, and rule out borderline mental retardation. He assigned a GAF score of 55.

On June 3, 2011, Barbara Markway, Ph.D., completed a Psychiatric Review Technique. (Tr. 303-14). Dr. Markway concluded that plaintiff had a medically determinable diagnosis of moderate adjustment disorder with anxiety and depressed mood. (Tr. 306). Plaintiff had moderate difficulties in maintaining concentration, persistence or pace and maintaining social functioning; she had mild restriction of daily

living activities. Dr. Markaway noted that the record contained no documented medically determinable impairment from April 25, 2005 -- the alleged date of onset -- to the date last insured.

Dr. Markway also completed a Mental Residual Functional Capacity Assessment. (Tr. 315-17). She found that plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make independent plans. Dr. Markway concluded that plaintiff retained the ability to understand, remember and carry out simple instructions, maintain adequate attendance, sustain ordinary routine without special supervision, interact appropriately with peers and supervisors, and adapt to most usual changes common to a competitive work setting.

On August 19, 2011, plaintiff requested a prescription for an antidepressant. (Tr. 330). On September 15, 2011, therapist Laura Still noted that plaintiff's mood was good and she did not seem overwhelmed. She had completed her court-ordered community service, but would not apply for jobs because she was scheduled for a hearing with the ALJ. She was continuing to work on completing tasks necessary to regain custody of her children. (Tr. 349). In October 2011, plaintiff's primary care physician increased her daily dosage of Adderall from 20 to 30 mg. (Tr. 330). In January 2012, Laura Still noted that plaintiff had a positive attitude and felt that the family had made significant progress in the last year. (Tr. 389). Plaintiff reported that she had not taken Xanax for a few weeks. (Tr. 392). In February 2012, plaintiff told her medical provider that she felt better overall. (Tr. 331).

On May 18, 2012, Laura Still completed a medical source statement. (Tr. 325-27). She opined that plaintiff had marked limitations in the ability to make work related judgments in simple and complex situations, carry out complex instructions, interact appropriately with the public, supervisors, and coworkers, and respond appropriately to usual work situations and to changes in routine. She had moderate limitations in the ability to understand, remember, and carry out simple instructions, and to understand and remember complex instructions. Ms. Still noted that plaintiff "gets overwhelmed then shuts down. She is also oppositional. If told or pressured to do something she gets defiant. She has low energy." (Tr. 324). Her problems started in childhood. She was able to manage benefits but did not make the best financial decisions.

On July 2, 2012, Dr. Harden completed a second psychiatric evaluation of plaintiff. (Tr. 338-42). Plaintiff reported that she was disabled because she was "slow at stuff like reading and easily distracted." Her current medications — Adderall and the antidepressant Pristiq — provided some benefit after she took her morning doses. She reported that she was able to manage her own money, medications and hygiene, and could complete her own housekeeping, cooking, and shopping. She was able to drive short distances, but became drowsy if she drove for longer periods. She reported having infrequent social contact with others. On examination, plaintiff was noted to be on time, with casual attire and satisfactory grooming. She showed interactive eye contact and a cooperative attitude, although her affect was bland. She displayed logical thought processes and had no speech eccentricities. She described her mood as vacillating between anger and sorrow. She had no difficulties with sleep, appetite or energy. Her concentration was adequate when taking Adderall. In assessing

plaintiff's cognitive functioning, Dr. Harden found that plaintiff's general fund of information, concentration and memory were adequate. She displayed a capacity to correctly interpret a simple proverb and was able to concentrate sufficiently to reverse her zip code. She displayed appropriate insight into her own situation. Dr. Harden's diagnostic impressions included bipolar disorder I per history. He assigned plaintiff a GAF of 65 for current level of functioning and a GAF of 70 for highest level of functioning in the past year. In a discussion section, Dr. Harden noted that plaintiff denied having ongoing significant restriction in daily activities due to emotional problems. He further noted that plaintiff showed no significant difficulties with concentration, persistence, or pace of task completion. "She sounds to have been a somewhat emotionally sensitive person in various employments having felt that those around her were critical of her." (Tr. 340). Dr. Harden completed a medical source statement in which he opined that plaintiff had no limitations beyond a mild limitation in the ability to make judgments on complex work-related decisions. (Tr. 334-36).

### III. The ALJ's Decision

In the decision issued on July 17, 2012, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through June 30, 2006.

2. Plaintiff has not engaged in substantial gainful activity since March 23, 2011, the alleged onset date.

3. Plaintiff has the following severe impairments: obesity, right shoulder tendonitis, carpal tunnel syndrome, bilateral meralgia paresthetica, affective disorder, and anxiety disorder.

4. Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except she is limited

-15-

to understanding, remembering and carry out simple instructions. She can use judgment and relate to supervisors, coworkers, and usual work situations, and can deal with changes in a routine work setting.

6.     Plaintiff is capable of performing her past relevant work as a poultry worker.

7.     Plaintiff has not been under a disability within the meaning of the Social Security Act at any time from March 31, 2011 through the date of the decision.

(Tr. 14-24).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See

20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side

effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.  Discussion

Plaintiff argues that the ALJ erred in not according controlling weight to the opinion of her therapist; incorrectly determined that her mental impairments do not meet the requirements of a listing; and incorrectly assessed her credibility.

### A.  Opinion of Laura Still

Laura Still found that plaintiff had marked impairments in the abilities to make work-related judgments in simple and complex situations; to carry out complex instructions; to interact appropriately with the public, supervisors, and coworkers; and to respond appropriately to usual work situations and to changes in routine.  Plaintiff alleges that the ALJ erred by giving Ms. Still's opinion little weight.  (Tr. 20).

Laura Still is an licensed clinical social worker and therefore is not an "acceptable medical source" as defined in the Social Security regulations.  Nishke v. Astrue, 878 F. Supp. 2d 958, 983 (E.D. Mo. 2012) (citing 20 C.F.R. §§ 404.1513(a)).  In Social Security Ruling 06-03p, the Social Security Administration clarified the consideration to be given to sources not classified as "acceptable medical sources."  See Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-03p).  According to the ruling, it is appropriate to consider such factors as "the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion."  SSR 06-03p, 2006 WL 2263437.

> Information from these "other sources" cannot establish the existence of a medically determinable impairment, according to SSR 06–3p. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may . . . provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

Sloan, 499 F.3d at 888. In determining what weight to give the opinion of an "other source," the ALJ has more discretion and is permitted to consider any inconsistencies found within the record. See Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) (discussing weight given to opinion of treating therapist). The ALJ does not err by discounting the opinion of a treating therapist that is inconsistent with objective psychological tests, is inherently inconsistent, or is inconsistent with other evidence in the record. Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006).

Plaintiff argues that the ALJ should have given greater weight to the opinion of Laura Still because she saw plaintiff for 36 visits. The ALJ noted that Laura Still's assessment was inconsistent with her treatment notes in which she indicated that plaintiff had made progress. In addition, Laura Still's assessment is inconsistent with the evaluations completed by Rebecca Still and Dr. Tichenor, both of whom assigned plaintiff GAF scores of 55, indicating the presence of only moderate symptoms.[7] Plaintiff notes that on May 3, 2011, Dr. Harden assessed plaintiff with a current GAF of 50, which supports a finding of severe impairments. However, Dr. Harden reevaluated plaintiff on July 2, 2012, and found that her GAF was 60. Finally, the ALJ

---

[7]The Social Security Administration does not consider GAF scores to "have a direct correlation to the severity requirements." Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000)). However, the Eighth Circuit considers the GAF scores in reviewing an ALJ's determination that a treating source's opinion was inconsistent with the treatment record. Id. (citing Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).

found that Laura Still's assessment was inconsistent with plaintiff's activities of daily living (discussed below).  The ALJ did not err in giving little weight to the opinion of Laura Still.

## B.  Listings 12.04 and 12.06

The ALJ found that plaintiff had the severe mental impairments of affective disorder and anxiety disorder.  Plaintiff asserts that the ALJ erred in failing to find that her impairments meet the requirements for Listing 12.04, pertaining to affective disorders, and Listing 12.06, pertaining to anxiety-related disorders.  20 C.F.R. § 404, App. 1.

Each Listing provides sets of criteria—titled A, B, and C—which a claimant must satisfy in various combinations to qualify.  Id.  Paragraph A sets forth the criteria to determine the presence of a specific mental disorder.  Id.  Paragraphs B and C set forth criteria describing impairment-related functional limitations; these limitations must be the result of the mental disorder found in Paragraph A.  Id.

Plaintiff challenges the ALJ's determination regarding the B criteria, which are identical for both Listing 12.04 and Listing 12.06. To satisfy the B set of criteria for Listing 12.04 and Listing 12.06, a claimant must show that she suffers at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

Id.  A "marked" limitation may arise when "several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to

-21-

interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." Id. The severity standards for Listing-level impairments are high, because "the listings [for adults] were designed to operate as a presumption of disability that makes further inquiry unnecessary[.]" Malott v. Colvin, 4:13-00877-CV-W-NKL, 2014 WL 2759421, at *3 (W.D. Mo. June 18, 2014) (quoting Sullivan v. Zebley, 493 U.S. 521, 532 (1990) (alterations in original)). It is the plaintiff's burden to show that she meets all of the specified criteria of a Listing. Id. (citing Boettcher v. Astrue, 652 F.3d 860, 863-64 (8th Cir. 2011); Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010)).

The ALJ determined that plaintiff had mild restrictions of the activities of daily living. He noted that plaintiff picked up her children from foster care every weekend and took them to visit other relatives. She had never missed this routine due to her impairments. She was able to drive, cook, do laundry, clean her house, go shopping, and do some yard work. She reported that she could manage her money, medications, and hygiene, and liked reading and spending time on the computer. (Tr. 14-15). Plaintiff argues that the ALJ ignored the evidence that she had marked limitations in "the daily activity of properly parenting her children." Pl. Brief at 10 [Doc. #14]. Evidence in the record supports a determination that plaintiff's parenting difficulties arose from significant family dysfunction, rather than plaintiff's alleged affective or anxiety disorders: plaintiff's children were removed from her care following an instance of extreme abuse, her husband faced possible imprisonment for that abuse, her oldest son displayed increasing levels of aggression, and the family had financial troubles. Plaintiff has not met her burden to establish that she had marked difficulties in the activities of daily living due to a mental impairment.

The ALJ found that plaintiff had moderate difficulties in the area of social functioning, citing her testimony that she visited with relatives on weekends, occasionally attended church, talked with family members on the phone, and shopped in stores. He also noted that she did not like strict or critical bosses but felt she could get along with bosses if they were nice. Plaintiff cites her March 2011 scores on various MMPI scales to support her claim that she suffers from marked difficulties in the areas of forming supportive relationships and social discomfort. (Tr. 274-75). However, the examiner noted that there was a possibility that plaintiff's MMPI profile "lacked accuracy due to exaggeration of psychopathology." (Tr. 274). Plaintiff also cites her elevated scores in tests of social phobia and worry or fears. (Tr. 277). However, shortly after beginning counseling, plaintiff reported that her mood had improved and she felt good about accomplishing things around the house with her husband. (Tr. 369). Furthermore, in January and February 2012, plaintiff apparently felt well enough to stop taking Xanax to treat her anxiety. (Tr. 392, 331). "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (citation omitted). Finally, Dr. Tichenor found that plaintiff's ability interact socially and adapt was lower than average, but not so low as to preclude employment. (Tr. 301).

The ALJ found that plaintiff had moderate difficulties with concentration, persistence, and pace. He noted that plaintiff told Dr. Harden that Adderall improved her concentration. In addition, Dr. Tichenor opined that plaintiff's ability to concentrate and sustain on-task performance was not so low as to preclude gainful employment. (Tr. 301). Finally, plaintiff reported that she was able to finish what she started and to get done what needed to be completed on any given day. Plaintiff argues that her

inability to complete the tasks necessary for having custody of her children returned to her demonstrates marked limitations in concentration, persistence, and pace.  Dr. Tichenor attributed these deficits to plaintiff's legal and child difficulties and opined that her emotional difficulties were likely to be temporary if she received appropriate support services.

Plaintiff argues that the ALJ failed to fulfill his duty to fully develop the record. When Dr. Tichenor completed his DSM-IV diagnostic impressions, he included the notation "Axis II: R/O Borderline Mental Retardation." (Tr. 301).  Plaintiff asserts that this notation means that Dr. Tichenor "wanted to rule out mental retardation" and that the ALJ was required to seek additional information.  A social security hearing is a nonadversarial proceeding and the ALJ has the duty to fully develop the record.  Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006); Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).  While the ALJ must neutrally develop the facts, the ALJ need not seek additional clarifying statements from a physician unless a crucial issue is undeveloped. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); see also Smith, 435 F.3d at 930 (ALJ's "duty may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped).  The ALJ is permitted to issue a decision without obtaining additional medical evidence so long as the evidence in the record provides a sufficient basis for the ALJ's decision.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).

The ALJ was not required to seek further development of the record in this case. First, a "rule out" diagnosis does not reflect a clinician's request to complete additional evaluation.  See Brumfield v. Colvin, 12-3033-CV-S-REL-SSA, 2013 WL 1121348 n.15 (W.D. Mo. Mar. 18, 2013) ("[T]he term 'Rule Out' just prior to a diagnosis [is used] to

indicate that not enough information exists to make the diagnosis, but it must be considered as an alternative.") Second, while Dr. Tichenor identified plaintiff's "less than average learning ability" as a factor in her ability to obtain and maintain employment, he did not say that her cognitive functioning precluded employment. Furthermore, he did not administer any formal tests of her cognitive functioning and thus his Axis II diagnosis is not entitled to great weight. Both Rebecca Still and Dr. Harden did conduct limited assessments of plaintiff's cognitive functioning; Rebecca Still found that plaintiff functioned in the low average range of cognitive ability and Dr Harden did not find evidence of impairments precluding work activity. (Tr. 272, 320-22). The record provides a sufficient basis for the ALJ's decision and he was not required to further develop the record.

## C. Credibility Determination

Plaintiff asserts that the ALJ conducted an improper "boilerplate" credibility analysis.

The ALJ found that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not fully supported. To the extent they are found credible, they are accommodated in the [RFC] assessment." (Tr. 23). As plaintiff points out, the Seventh Circuit has harshly criticized similar summations of a claimant's credibility. Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012).

> Such boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible. More troubling, it appears that the Commissioner has repeatedly been using this same boilerplate paragraph to reject the testimony of numerous claimants, without linking the conclusory statements contained therein to evidence in the record or even tailoring the paragraph to the facts at hand, almost without regard to whether the boilerplate paragraph has any relevance to the case.

Id. (citation omitted).

Plaintiff's point would be well-taken if the ALJ had merely relied on the "boilerplate language." In this case, however, the ALJ conducted a thorough credibility analysis, considering plaintiff's activities of daily living, her testimony, the objective medical evidence, her compliance with treatment, the effectiveness of treatment, and medical opinion evidence. (Tr. 22-23).

Plaintiff also argues that the ALJ placed too much weight on her activities of daily living, again citing her inability to parent her children. The ALJ concluded that plaintiff's legal problems, her children's poor behavior, inadequate social support, and inadequate finances "are not normally considered . . . in determining a claimant's ability to perform work-related activities." Tr. 19. A finding of disability must be based solely upon the presence of a medically determinable physical or mental impairment, and not the kind of social dysfunction plaintiff cites. 42 U.S.C. § 1382c(a)(3)(A). The ALJ did not err in his assessment of plaintiff's credibility.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

IT IS HEREBY ORDERED that the decision of the Commissioner is affirmed.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of February, 2015.